

2014 JUL 28 AM 11: 50

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 70243-2-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL LOVEJOY GRUNDY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: July 28, 2014 |
| | ) | |

LAU, J. — A court must give an inferior degree offense instruction if, among other things, there is affirmative evidence that only the inferior degree offense was committed. In this prosecution for second degree assault, the court gave an inferior degree instruction for third degree assault but refused to give one for fourth degree assault. Because there was evidence supporting an inference that Michael Grundy committed only fourth degree assault when he punched Darius Babcock in the face, the trial court erred in refusing Grundy's request for a jury instruction on fourth degree assault. We reverse Grundy's conviction for third degree assault and remand for further proceedings.

## FACTS

Based on allegations that Grundy punched Babcock in the face at a college party and broke his jaw, the State charged Grundy with second degree assault.

At trial, the evidence established that on May 21, 2011, Grundy and Darius Babcock were students at Western Washington University in Bellingham. Babcock testified that he went to a house party that night with his friend Kevin. People at the party were drinking alcohol, dancing, and playing "beer pong." After about two hours, the police arrived and Babcock left.

He walked several blocks to another house that was surrounded by a small crowd of people and police cars. There was some commotion in the crowd and the homeowner was yelling at people to get off his lawn. Babcock was standing in the street when a police officer started telling everyone to calm down and go home.

The next thing Babcock knew, he was picking himself up from the ground and feeling pain in his jaw. Police told him what had happened. It is undisputed that Grundy punched Babcock and fractured his jaw. The injury required surgery and caused Babcock pain for six months.

Grundy testified that he went to the same two houses that Babcock went to that night. At the house where the assault later occurred, an intoxicated Grundy leaned on a car for balance as he tried to call a friend to pick him up. As police cleared the crowd away from the house and into the street, three or four young men suddenly approached Grundy, demanded to know what he was doing, and told him to "get the fuck off the car." 3 Verbatim Report of Proceedings (Mar. 13, 2013) (VRP) at 483-84. When

Grundy, who is black, explained that he was trying to make a phone call, the men said, "[G]et off the car, nigger." VRP at 485.

Grundy testified that the next time he looked up, the group of three young men had grown to eight. They continued to demand that he "get the fuck out of here." VRP at 485. Grundy realized that he was still leaning on the car. When he stepped back from the car, his friend, Yonas Ayele, arrived.

Ayele testified that he saw a group of eight or ten people around Grundy and heard someone say, "[G]et the fuck off the car." VRP at 357. He asked what was going on, and they said, "This nigger wouldn't get off the car." VRP at 357. The group then demanded "in a more aggressive tone" that Grundy "get the fuck off the block." VRP at 359.

At this point, another friend of Grundy's, Mulu Gebreselsae, arrived. Gebreselsae testified that the group grew from seven or eight to "16 people surrounding us." VRP at 416. Some of the crowd took their shirts off, and Gebreselsae felt threatened. He felt they "were getting ready to fight." VRP at 418. The crowd began to close in on Grundy, Ayele, and Gebreselsae. All three described people in the crowd with "balled up" fists. VRP at 419. Gebreselsae testified, "[T]he crowd kept getting closer and closer," and his space "was getting smaller." VRP at 419. When asked how close the crowd was to Grundy, Gebreselsae said, "Close, face to face." RP at 448.

Grundy testified that the group started "really making threats like coming toward us, closing in on us." VRP at 492. Grundy heard people in the crowd muttering to each other, "[L]et's kick their ass," and "We can take these guys." VRP at 487, 490.

Around this time, the police arrived. Some people stopped harassing Grundy, but others did not seem to care about the police. Grundy testified that he was facing the crowd, not the police, and did not dare turn his back to see how far away the police were or what they were doing.

Ayele testified that Babcock was in the crowd that was harassing Grundy and was repeating the same types of things the others were saying. The group "started approaching [Grundy.]" VRP at 363. Ayele described the crowd's behavior as "angry" and "aggressive." VRP at 379. Noting that they were outnumbered, Ayele testified that he felt threatened and was scared "[t]hat we were going to get jumped by those guys." VRP at 403.

Grundy testified that he heard someone saying, "[Y]ou are still here? . . . [T]his guy really wants to get his ass kicked." VRP at 506-07. Then someone in the crowd yelled, "[W]here your friends at now?" VRP at 507. Grundy looked around and did not see Ayele or Gebreselsae. He saw four or five young men from the group move toward him. He tried to move to the left but found his path blocked by Babcock. Grundy thought Babcock "was trying to box me in, cut me off." RP 510. Grundy dropped his head and swung at Babcock in an attempt to clear a path out of the group. Grundy testified that he aimed for Babcock's upper body, not his jaw, and denied any intent to injure. He had no "reason to believe that throwing that punch would cause that kind of injury[.]" VRP at 514.

Grundy looked up briefly and then ran away from both the crowd and the police. When he saw a police car in front of him, he stopped, but then heard footsteps behind

-4-

him. Fearing the crowd was still after him, he kept running until police hit him with a taser.

Bellingham Police Officer Ben Horton testified that he had an unobstructed view of the crowd, including Babcock and Grundy. Without any warning or observable provocation, Grundy suddenly lunged toward Babcock and hit him in the face with his fist. Officer Horton called the punch a "haymaker," which he defined as a punch preceded by the puncher cocking his fist and shoulder to gain momentum and power. Grundy then stood up, looked at the officers, and then fled on foot. During the ensuing foot chase, the officers identified themselves as police and told Grundy to stop. He kept running. The officers warned him that he would be "tasered" if he did not stop immediately. When Grundy continued to run, the officers successfully "tasered" him and subsequently arrested Grundy.

Bellingham Police Officer Kevin Freeman testified that he did not see the punch but heard a thud and saw Grundy, Babcock, and a young woman fall to the ground in front of him. Freeman asked Grundy why he punched Babcock and Grundy said, "[H]e hit me first." 2 VRP (Mar. 12, 2013) at 130.

Following extensive arguments on whether the court should instruct the jury on the inferior degree offenses of third and/or fourth degree assault, the court ruled that it would instruct the jury only on second and third degree assault. The court also instructed the jury on self-defense.

During deliberations, the jury submitted the following inquiry: "Is there a lesser charge available than what we have at this time?" The court responded, "You must rely solely upon the instructions before you." The jury found Grundy not guilty of second

degree assault and convicted him of third degree assault. The court imposed a sentence of 90 days' confinement with 30 days to be served in jail alternatives. Grundy appeals.

## DECISION

Grundy contends the court erred in refusing to instruct the jury on fourth degree assault. He argues that the jury heard evidence that, if believed, would support a conclusion that only fourth degree assault occurred. We agree.

A defendant is entitled to an instruction on an inferior degree offense if (1) the statutes for both the charged offense and the proposed inferior degree offense proscribe but one offense, (2) the information charges an offense that is divided into degrees and the proposed offense is an inferior degree of the charged offense, and (3) there is evidence that the defendant committed only the inferior offense. Fernandez–Medina, 141 Wn.2d 448, 454-55, 6 P.3d 1150 (2000). In determining whether the evidence supports the giving of an inferior degree instruction, we view the evidence in the light most favorable to the party that requested the instruction." Fernandez–Medina, 141 Wn.2d at 455–56. We review a trial court's decision on an inferior degree offense instruction de novo. See Fernandez–Medina, 141 Wn.2d at 454 (stating three-part test that includes legal and factual components); State v. Dearbone, 125 Wn.2d 173, 178, 883 P.2d 303 (1994) (noting that mixed questions of law and fact are reviewed de novo).

Here, the court instructed the jury on second and third degree assault. To convict Grundy of second degree assault under the court's instructions, the jury had to find that Grundy "intentionally assaulted DJ Babcock" and "thereby recklessly inflicted

-6-

substantial bodily harm . . . ." See RCW 9A.36.021(1)(a). The instructions stated that a person "acts recklessly when he or she knows of and disregards a substantial risk that a particular result, to wit: substantial bodily harm, may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation." (Emphasis added.) See RCW 9A.08.010(1)(c). To convict Grundy of third degree assault, the jury had to find that, "with criminal negligence," Grundy "caused bodily harm to DJ Babcock . . . [t]hat. . . was accompanied by substantial pain that extended for a period of time sufficient to cause considerable suffering[.]" The instructions stated that a person acts with "criminal negligence" if he or she "fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

The court did not instruct the jury on fourth degree assault. A person commits fourth degree assault if he or she "under circumstances not amounting to assault in the first, second, or third degree . . . assaults another." (Emphasis added.) RCW 9A.36.041; State v. Taylor, 140 Wn.2d 229, 237, 996 P.2d 571 (2000); State v. Wilson, 125 Wn.2d 212, 217–18, 883 P.2d 320 (1994). Fourth degree assault may be committed by intentionally committing an unlawful touching or striking, regardless of whether physical harm results. State v. Davis, 60 Wn. App. 813, 821, 808 P.2d 167 (1991). The intent for this form of assault is simply intent to do the physical act. State v. Jarvis, 160 Wn. App. 111, 117 n.4, 119, 246 P.3d 1280 (2011) (intent for the intentional touching or striking form of assault "is merely the intent to make physical contact with the victim . . . .").

Grundy contends, as he did below, that the court was required to instruct the jury on fourth degree assault because it is an inferior degree offense and there was evidence supporting a conclusion that only fourth degree assault occurred. Noting that the higher degrees of assault require a guilty mental state regarding the scope or risk of the harm inflicted, Grundy contends his testimony supported inferences that he lacked those mental states and therefore committed an assault "under circumstances not amounting to assault in the first, second or third degree . . . ." RCW 9A.36.041. We agree.

First degree assault requires intent to inflict great bodily harm. RCW 9A.36.011. Grundy testified, however, that he did not intend to injure Babcock. If believed, this testimony would establish that Grundy did not commit first degree assault.

Second degree assault requires an assault with reckless infliction of substantial bodily harm. The recklessness element requires knowledge of a substantial risk that a wrongful act may occur, as well as a disregard of the risk that amounts to a gross deviation from what a reasonable person would do under the circumstances. Grundy testified that there was an imminent threat to his safety, that he punched to open a path to escape, that he aimed for Babcock's upper torso, that he did not intend to injure Babcock, and that he had no reason to believe that his punch "would cause that kind of injury." Viewed in a light most favorable to Grundy, this testimony could support conclusions that he did not act with knowledge of a substantial risk of a wrongful act or that his conduct was not a gross deviation from what a reasonable person would do given the threat he perceived. Either of these conclusions would preclude a conviction for second degree assault.

-8-

The same testimony could support a conclusion that third degree assault did not occur. As noted above, third degree assault requires a failure to be aware of a substantial risk that a wrongful act may occur, which failure amounts to a gross deviation from the standard of care. Grundy's testimony, if believed, could support a conclusion that, under all the circumstances, his failure to be aware of the risk that his act could be wrongful was not a gross deviation from the standard of care. Such a conclusion would preclude a conviction for third degree assault.

Thus, viewed in a light most favorable to Grundy, his testimony supports a conclusion that the assault occurred under circumstances not amounting to the higher degrees of assault and that only fourth degree assault was committed.[1]

We reject the State's argument that fourth degree assault did not occur because "[t]he only way to commit fourth degree assault is to intentionally touch someone without inflicting bodily harm." Resp't's Br. at 14. Fourth degree assault is not defined by the degree of harm inflicted. Rather, it includes any harmful touching or striking occurring "under circumstances not amounting to assault in the first, second, or third degree . . . ." RCW 9A.36.041; State v. Tyler, 138 Wn. App. 120, 130, 155 P.3d 1002 (2007). An assault does not amount to first, second, or third degree assault, and is therefore fourth degree assault, if an intentional touching or striking results in harm but either the requisite mental state or degree of injury for the higher degrees of assault are not

---

[1] We note that a conclusion that Grundy's conduct was not a gross deviation from the standard of care would not necessarily mean that Grundy acted in self-defense and, thus, did not commit fourth degree assault. Rather, a jury could conclude that his punch, while not a gross deviation from the standard of care, nevertheless was thrown with more force than necessary under the circumstances and thus was not lawful self-defense.

70243-2-I/10

satisfied. See RCW 9A.36.041. As discussed above, the jury in this case could infer from the evidence that the mental states for first, second, and third degree assault were not satisfied.

The trial court erred in refusing to give the requested instruction on fourth degree assault.

Reversed and remanded for further proceedings.[2]

WE CONCUR:

---

[2] Given this disposition, we need not address Grundy's remaining assignments of error.

-10-